Phillip Stanley Hope was indicted for the first degree murder of Louie Earl Jones. The jury found the appellant "guilty of murder in the first degree, as charged in the indictment" and fixed his punishment at imprisonment for life. The trial court set sentence accordingly.
On March 25, 1978, the remains of Louie Earl Jones were found floating in Waxahatchee Creek on the Shelby County, Alabama, line by James Robert Gaston and Benjamin Pemberton. The Shelby County Coroner, Ed Burdette, was summoned and he examined the body at the scene. He testified that he observed red marks and swelling around the eyes and mouth of the deceased but he did not notice any puncture wounds. The deceased was wearing blue jeans, a white T-shirt, and socks, but no shoes. Mr. Burdette stated that the body of the deceased was removed to a funeral home in Columbiana, Alabama, where he later reexamined it. He indicated that the body was in substantially the same condition at the funeral home as it was when he examined it at the creek.
Mr. Burdette also identified a striped, short-sleeved shirt which was given to him as evidence by a deputy sheriff at the creek where the body of the deceased was found. The shirt was received into evidence as State's Exhibit Two. On cross-examination Mr. Burdette stated that the shirt was found in the same area as the body of the deceased.
Approximately a week later, a pair of shoes, identified as those of the deceased, was found by scuba divers in the same area of Waxahatchee Creek where the deceased's body was found.
James Wyatt and James Nesbitt testified that they were camping near Waxahatchee Creek with two companions, Ernest and Bill Rivers, on the night of March 24, 1978. They testified that, at approximately 1:30 a.m., they were awakened by a disturbance in the water of the creek. They shined a spotlight in the direction of the disturbance and observed two white males in the water *Page 1079 
of the creek and another white male sitting on the bank. One of the figures in the water appeared to strike the other. James Wyatt and James Nesbitt both stated they heard one of the figures say, "Stay down," and another say, "Please, Bill, I love you like a brother."
After the light was shone on the figures in the water, one of the figures began pushing the other toward the bank and the disturbance ended. Approximately five minutes later, a car started and drove off with its headlights off.
The victim's bother, Johnny Edward Jones, testified that, about two weeks before his brother's remains were discovered, his brother had called him late at night and asked to be picked up at their aunt's house. The witness recalled that when he picked his brother up his brother was "scared to death," and "white as cotton." The witness indicated that at that time his brother told him that the appellant and his brother, Bobby Joe Hope, had taken him to a dump to kill him.
Tammy Moulton Ratliff testified that she had a date with the deceased, Louie Earl Jones, on the evening of March 24, 1978. Mrs. Ratliff recalled that, after spending an hour at a nightclub, she and the deceased went to a hill overlooking the Shelby County boat launch. The appellant and Bobby Joe Hope arrived at the hill a short time later and began arguing with Louie Earl. According to Mrs. Ratliff, the appellant and Bobby Joe Hope told Louie Earl that, if he called the law again, they were going to "get him." Thereafter, the appellant started hitting Louie Earl and shoving him around. Louie Earl broke away and ran down the hill and the appellant's brother went after him.
At about that time Donnie Edge and Terry Moore drove up in a truck. They testified at trial that they heard the appellant and his brother arguing with Louie Earl when they drove up. Terry Moore testified that he heard the appellant say to Louie Earl Jones, "Louie Earl, I'll beat you all the way to the river," and Louie Earl replied, "I know you will Phillip, we're friends." Both witnesses testified that Tammy Ratliff was crying and upset and asked to be taken from the scene. Also, both witnesses stated that they left with Tammy and that Louie Earl remained with the appellant and his brother. Terry Moore recalled that when they left Louie Earl appeared to be scared.
The State Toxicologist, James M. Buttram, testified that he performed an autopsy on the remains of Louie Earl Jones on March 25, 1978, at the Bolten Funeral Home in Columbiana, Alabama. The autopsy revealed that the deceased died by drowning. The witness stated that the face of the deceased showed bruises around the mouth and eyes and that the bruises could only have developed prior to death.
On cross-examination the toxicologist indicated that the deceased was intoxicated at the time of his death and that death could have occurred at any time from 8:00 o'clock p.m. on March 24, 1978, to 4:00 o'clock a.m. on March 25, 1978.
Charles Barnett testified that he was a contractor and that the appellant and his brother had worked for him in March, 1978. Mr. Barnett related conversations he had with the appellant and his brother during the early part of that month. According to Mr. Barnett the appellant and his brother had had a dispute with Louie Earl Jones over some tools and Louie Earl had "called the law" on them. Mr. Barnett stated that the two brothers told him that "they were going to get their tools one way or the other or they would dump him in the river." Mr. Barnett also related the following incident which occurred after the deceased's body had been found (R.p. 285):
 "A. Well, we was on the way to work and we was just all talking and I had the tapeplayer on and I reached over and pulled out the tape and Phillip and Bobby Joe was having a conversation and Bobby Joe had told Phillip, he said, `Well, we got rid of him, didn't we,' and they sort of looked at me funny and I just looked away, because I didn't-I just looked away from them and went on to work.
"Q. He said, `We got rid of him,' is that correct? *Page 1080 
"A. Correct."
Deputy Sheriff Charles Shaw testified that he investigated an altercation between Louie Earl Jones and the Hope brothers in the early part of March, 1978. Deputy Shaw indicated the three men were in a dispute over the ownership of some tools in the possession of Louie Earl Jones. The deputy recalled that Louie Earl told him that he was afraid that the Hope brothers were going to hurt him and kill him. The deputy ordered the Hopes to leave and they left.
Ronald Cox testified for the defense that he was at the lounge the night of March 24, 1978, and that Donald Edge came into the lounge with Tammy Ratliff and said, "We just killed a man."
Randy Collum testified that he was also in the lounge on the night of March 24, 1978, and that he heard Donald Edge say, "We just drowned Louie Earl Jones."
Paulette Horten, who was working at the lounge that night, testified that she heard Donald Edge say he had thrown Louie Earl Jones in the river.
Debra Busby testified that the appellant and his brother were with her from 12:30 a.m. until daylight on March 25, 1978.
The appellant did not testify at trial.
 I
Appellant first contends on appeal that the trial court erred in overruling his motion to exclude the State's evidence. Appellant argues that "the evidence presented by the State of Alabama . . . was entirely circumstantial" and thus insufficient to submit to the jury.
We have long held, however, that circumstantial evidence may afford satisfactory proof of the corpus delicti in a murder prosecution, and if facts are presented from which the jury may reasonably infer the crime has been committed, the question must be submitted to the jury. Kontos v. State, Ala.Cr.App.,363 So.2d 1025 (1978), and cases therein cited; McDowell v.State, 238 Ala. 101, 189 So. 183 (1939).
In the present case the facts and circumstances presented by the State's case in chief were sufficient to require submission of the case to the jury. We find the following facts and circumstances sufficient to support our ruling that the trial court did not err in denying appellant's motion to exclude.
1. About two weeks prior to the victim's death, the appellant, his brother, and the deceased had a dispute over tools (Deputy Shaw's testimony).
2. As a result of the dispute, the appellant and his brother threatened to dump Louie Earl Jones in the river (Charles Barnett's testimony).
3. The victim told his brother that the Hope brothers had tried to kill him (Johnny Edward Jones' testimony).
4. The night before the victim's remains were found, the appellant and his brother argued with and started hitting and shoving the victim near the Waxahatchee Creek (Tammy Ratliff's testimony).
5. The victim was left alone and was last seen alive with the appellant and his brother (Edge and Moore's testimony).
6. The toxicologist testified that the victim's face was bruised and swollen and that his death was caused by drowning.
7. Appellant's brother stated to appellant, "Well, we got rid of him, didn't we?" This statement was made after the victim's remains were found (Charles Barnett's testimony).
Thus the trial court correctly submitted this case to the jury.
 II
Appellant next contends that the trial court erred in not giving certain requested written charges at the conclusion of the oral charge to the jury.
The appellant's requested charges were either covered by the trial court's oral charge or other given charges or were abstract charges not properly predicated on the evidence in the case or were incorrect statements of the applicable legal *Page 1081 
principles. Kuczenska v. State, Ala.Cr.App., 378 So.2d 1182, cert. denied, Ala., 378 So.2d 1186 (1979), and authorities cited therein.
Appellant's requested charge on circumstantial evidence (R.p. 476) was properly refused.
 "As we have held in previous cases on requested charges similar to those presently before us, where not all of the State's case is derived from circumstantial evidence and where the requested charges do not call for consideration of all the evidence, such charges concerning circumstantial evidence are properly refused. Johnson v. State, 55 Ala. App. 581, 317 So.2d 548 (1975); Jones v. State, 54 Ala. App. 167, 306 So.2d 33 (1974). Also, the requested charges were not hypothesized on a `belief from the evidence' and were defective for that reason. Thompson v. State, 369 So.2d 50
(Ala.Cr.App.), cert. denied, 369 So.2d 52 (Ala. 1979); Hudson v. State, 335 So.2d 208 (Ala.Cr.App.), cert. denied, 335 So.2d 211 (Ala. 1976).
 Murrell v. State, Ala.Cr.App., 377 So.2d 1102, cert. denied, Ala., 377 So.2d 1108 (1979).
 III
Appellant also argues that the testimony of the state toxicologist should not have been admitted because a proper "chain of evidence" was not established regarding the condition of the remains of the deceased.
The coroner of Shelby County testified that when the deceased was removed from Waxahatchee Creek he was wearing blue jeans, a white T-shirt, and socks. The coroner observed that the body was loaded into a hearse, and he followed the hearse in his car to the Bolten-Brown Funeral Home in Columbiana. He further stated that the body was in substantially the same condition when it arrived at the funeral home as when it was loaded into the hearse. The coroner left the funeral home before the state toxicologist arrived.
When the state toxicologist arrived to conduct an autopsy to determine the cause of death, it appears that the body was not wearing a T-shirt.
Appellant therefore claims that the testimony of the toxicologist should not have been admitted because the body had been tampered with. We disagree.
 "In order for such testimony to be admissible it is not required that proof be made that the body was in the exact condition as it was when death occurred. The evidence was prima facie admissible if it is shown that the body had undergone no substantial change with regard to the matter under investigation; that there had been no illegal tampering with it or that any alteration from its original condition at death did not obliterate or change the condition which is sought to be shown. If, as here, the change was incidental and in no way affected the question at issue, the testimony was admissible. . . ." (Citations omitted.)
 Dennison v. State, 259 Ala. 424, 429, 66 So.2d 552, 556 (1953).
In the present case, the "condition sought to be shown" was the cause of death of the deceased. The fact that the deceased's T-shirt had been removed prior to autopsy was not such a substantial change in the condition of the body as would cause the testimony of the toxicologist to be thereby rendered inadmissible.
 IV
Finally, appellant complains that the following exchange "was extremely prejudicial to the defendant and constitutes reversible error." The matter arose after the appellant called Deputy Sheriff Bill Davenport as a witness (From the record, pp. 348, 349):
 "Q. On the night of 24 of March, 1978, state whether or not Donny Edge told you what time he got up to that hill?
 "MR. VALESKA: We object to what Donny Edge told him. Donny Edge has testified in this case, in front of this jury, under direct and cross-examination. This witness cannot testify to what Donny Edge
. . . . . *Page 1082 
 "THE COURT: All right, just let the Court rule, I sustain the objection.
 "Q. Didn't he, in fact, tell you that he got up there after eleven o'clock?
"MR. VALESKA: And we object to that.
 "THE COURT: I sustain the objection and ask Counsel not to phrase the question to the witness in an indirect manner as a cross-examination and to subvert the ruling of the Court.
 "MR. CONWILL: Again, we would ask to have him treated as a hostile witness.
"THE COURT: I deny that request.
 "MR. HARRISON: Is he permitted to ask him to state whether or not?
"THE COURT: That would be all right.
 "Q. Did you ever go talk with Coleman Vanderslice about this?
"A. No, sir, I did not.
 "Q. You gathered some information, during the course of this investigation, that Donny Edge had come back into Chuck and Betty's and said, `I just threw Louie Earl off the bridge?"
 "MR. VALESKA: Judge, you just told him not to do that.
"MR. CONWILL: May I ask my question.
 "MR. VALESKA: No. Judge, I object, because you just told him not to do it.
 "THE COURT: Yes, sir, Mr. Conwill, you are trying to cross-examine this witness.
 "MR. CONWILL: Yes, sir, I am trying to cross-examine what I feel like is a hostile witness.
 "THE COURT: And the Court said that he is not a hostile witness and the Court is not going to permit you to cross-examine this witness and get all that gobbley gook before the jury.
 "MR. CONWILL: Judge, we object to calling our evidence gobbley gook.
 "THE COURT: I will state to the court, in the presence of the jury, that your last question was gobbley gook and, in the judgment of the Court, intended nothing but to confuse the jury.
 "MR. CONWILL: We would except to that and object to it, the Court's statement to the jury.
 "THE COURT: You are doing nothing but trying to cross-examine this witness and the Court has ruled that you cannot do it.
"MR. HARRISON: We want to get in all we can, Judge.
"THE COURT: Yes, sir, I know what you want to get in.
 "MR. HARRISON: I know that and it is our job to do it.
 "THE COURT: Do you have any further questions of this witness:
"MR. CONWILL: Yes, sir.
"THE COURT: All right, start asking them."
After a close examination of the record, we are of the opinion that the remarks of the trial judge did not reflect partiality against the accused, but was directed toward eliminating unnecessary repetition in appellant's questioning of his witness. Burke v. State, 44 Ala. App. 379, 209 So.2d 859
(1968).
The trial court had repeatedly sustained the prosecutor's objections to the questions appellant's counsel asked of the witness, yet appellant's counsel repeatedly sought to ask the same questions.
"The comment of the judge would probably have been best left unsaid, but we do not believe appellant's rights were prejudiced." Mullins v. State, 56 Ala. App. 460, 323 So.2d 109, cert. quashed, 295 Ala. 412, 323 So.2d 116 (1975); Hinkle v.State, 50 Ala. App. 215, 278 So.2d 218 (1973).
This record is free of error. Therefore, this case is due to be and is hereby
AFFIRMED.
All the Judges concur. *Page 1083